166 P.3d 505 (2007)
2007 OK CIV APP 73
In the Matter of E.S., a deprived child.
Jennifer S., Appellant,
v.
The State of Oklahoma, Appellee.
No. 104,266.
Court of Civil Appeals of Oklahoma, Division No. 4.
July 10, 2007.
*507 Robert A. Ravitz, Public Defender, Julie Howard, Assistant Public Defender, Oklahoma City, OK, for Appellant.
C. Wesley Lane, District Attorney, Benjamin J. McGoldrick, Assistant District Attorney, Oklahoma City, OK, for Appellee.
Timothy Mills, Oklahoma City, OK, for Minor Children.
Released for Publication by Order of the Court of Civil Appeals of Oklahoma, Division No. 4.
JERRY L. GOODMAN, Judge.
¶ 1 Jennifer S. (Mother) appeals the trial court's January 9, 2007, order terminating her parental rights in her minor child, E.S., following a jury trial. State sought termination of Mother's rights pursuant to 10 O.S. 2001, § 7006-1.1(A)(5), alleging Mother had failed to correct the conditions which led to E.S.' deprived status. Based upon our review of the facts and applicable law, we affirm.[1]

FACTS
¶ 2 On or about November 5, 2005, Mother and E.S. were found in a dilapidated shed with a twenty-two (22) year old registered sex offender (sex offender). Since Mother was only fifteen (15), the police transported both Mother and E.S. to a juvenile shelter and both were taken into protective custody by the Department of Human Services (DHS). Mother, deemed a chronic run-away by the police, promptly ran away from the shelter. Although Mother returned, she continued to run away.
¶ 3 On November 14, 2005, State filed a petition alleging E.S. was deprived. Mother stipulated to an amended deprived petition on December 12, 2005, which alleged E.S. was deprived because he was destitute or homeless; did not have the proper parental care and guardianship; and/or the home was an unfit place by reason of neglect by the parent. The petition further alleged more specific allegations: Mother failed to adequately provide for E.S.' safety and welfare; in March of 2004, Mother was the subject of a DHS referral which alleged she met a man, whose name she does not remember, on a singles line who subsequently forced her to perform oral sex; Mother met sex offender on a singles line; Mother represented sex offender was 17, but he is really 22; Mother and minor child were found in a dilapidated shed, sitting on a filthy mattress, and it appeared they were living there; Mother indicated to police she was having a sexual relationship with sex offender; and Mother indicated to police she did not care if sex offender was around E.S.
¶ 4 On January 30, 2006, the court adopted an individualized service plan (ISP). The ISP required Mother to: 1) enroll, attend, participate, and successfully complete parenting classes and to be able to successfully demonstrate and utilize the skills learned; 2) attend and participate in individual and family counseling; 3) provide a clean, hazard-free, and loving home for E.S.; 4) enroll and attend school or an education program; 5) attend and successfully complete a non-offenders sexual abuse program; and 6) obtain a lawful source of income. The ISP was amended on March 20, 2006, to include substance abuse treatment after Mother tested positive for methamphetamine and subsequently, cocaine. Due to Mother's positive drug tests, Mother's visitation with E.S. was suspended in March of 2006 pending eight (8) consecutive clean drug tests.
¶ 5 Since Mother was also a minor, a deprived petition was filed on her behalf. On or about December 14, 2005, Mother was placed in the custody of her father, E.S.' maternal grandfather, Scott S. (Grandfather). Mother continued to run away and although prohibited by the court, Mother continued to see her mother, E.S.' maternal grandmother (Grandmother), a known drug addict, and sex offender.
¶ 6 After several periodic hearings before the court to review Mother's progress, State moved to terminate Mother's rights on May 9, 2006, pursuant to 10 O.S.2001, § 7006-1.1(A)(5). State alleged Mother had failed to correct the conditions which led to E.S.' deprived status.[2] A jury trial was originally set *508 for October of 2006, but was continued to December 12, 2006. At trial, State presented the testimony of Maria Cerventes (Cervantes), a police officer; Grandfather; Mother; and Tina Williams (Williams), a DHS child welfare worker. Carl Abrehamson, E.S.' foster parent, was called on behalf of the minor child. Mother presented the testimony of Janet Daniels, a counselor with Total Life Counseling (TLC).
¶ 7 Cervantes testified that on November 5, 2005, she found Mother, E.S., and sex offender in an old, rotted shed behind a house. The three were sitting on an old, mildewy, wet mattress on the floor, huddled together trying to keep warm, and that it looked like they were living in the shed. Mother admitted she knew the man was a registered sex offender, that she was having sexual relations with him, and she was not concerned about him being around E.S.
¶ 8 Grandfather testified Mother ran away several times after being placed in his custody in December of 2005 and that Mother made little, if no progress on the ISP until State filed the petition to terminate on May 9, 2006. At this time, Mother started to work the plan, although she either stopped going to class or would be kicked out for non-participation. Grandfather testified that in June of 2006, Mother was picked up by the police after an altercation with sex offender.
¶ 9 Grandfather further testified when the parties convened for the original October 2006 jury trial, Mother really "turned around and started doing everything that she was supposed to do." Mother re-started parenting classes, which she finished the night before the current December trial started, and she re-started sex offender classes, which she is scheduled to finish during the current trial. In addition, Mother attended a substance abuse program and her drug tests have been clean, although he acknowledged she was recently kicked out of the class for non-participation. Mother has not had any contact with sex offender, noting the last time he came by she called the police. Finally, Grandfather stated Mother has been more respectful and she has not run away in several months.
¶ 10 Mother testified that prior to November 5, 2005, she had been dating sex offender for five (5) months. Mother stated she and sex offender were only in the shed for thirty (30) minutes while they were waiting for friends. Mother admits she ran away from the shelter and her father's home numerous times.
¶ 11 Mother further testified she understood what was required under the ISP. Mother stated she started some of the required classes, but then stopped. Mother acknowledged she continued to see sex offender and Grandmother during this time. By the March court hearing, Mother stated she had not completed any part of the ISP and had tested positive for methamphetamine and later, cocaine.
¶ 12 After the May petition to terminate was filed, Mother testified she continued to see sex offender, continued to run away, she was not working or attending school, but she thinks she was attending a substance abuse program. Mother testified she has not seen E.S. since February of 2006 because visitation had been suspended due to drug usage. After she came to court in October for trial, Mother stated she started working the ISP and that she has completed a parenting class, the non-offender sexual abuse program, she is currently working towards her GED, she has had no contact with sex offender in a few months, she has been attending a substance abuse program, she had four (4) random negative drug tests during November and December of 2006, and she is really trying to turn her life around. Mother loves E.S. and wants another chance.
¶ 13 Mother acknowledged, however, that she has not attended and completed the required family or individual counseling, she does not have a job, and she has not completed substance abuse counseling because in December of 2006 the counselor asked her to leave because of non-participation.
¶ 14 Williams stated she is the DHS permanency planning worker assigned to the case. Williams testified to Mother's failure to complete the requirements set forth in the *509 ISP and that Mother did not correct the conditions that led to E.S.' deprived status. Williams stated the only aspect of the plan Mother completed was the parenting and non-offenders classes, although she was unable to demonstrate the skills learned as required under the ISP. With respect to a substance abuse program, Mother initially attended a program, but was dropped for non-participation. Mother also attended a residential program, but left after two (2) hours. Mother re-started an out-patient program on November 21, 2006, but was kicked out of the class for non-participation on December 5, 2006. Thus, Mother did not complete a substance abuse program.
¶ 15 Williams further noted Mother did not complete school or receive a GED or the required family and individual counseling. Williams testified that although Mother completed a couple of items on the ISP, notably within the last month, she did not correct the conditions that led to E.S.' deprived status and that it was in E.S.' best interests that Mother's rights be terminated.
¶ 16 Abrehamson, E.S.' foster parent, testified E.S. is thriving in his current placement despite his numerous medical issues over the past year. Daniel, a substance abuse counselor at TLC, testified she met Mother on November 21, 2006, when Mother was admitted for intensive out-patient treatment. Daniels testified Mother is a very shy, quiet person who did not participate in class. By Mother's third class, on or about December 5, 2006, she asked Mother to leave for the day for refusing to participate, which is an integral part of completing the class. Mother never returned and has not called to see if it is her turn to be randomly drug tested. Daniels recommends Mother go to a residential substance abuse program with individuals more her age because she is deemed high risk for substance abuse.
¶ 17 At the conclusion of the trial, the jury, by a vote of 5 to 1, found the allegations of the petition to terminate were true and that termination was in the best interests of E.S. The trial court subsequently entered an order terminating Mother's parental rights. Mother appeals.

STANDARD OF REVIEW

State's Burden of Proof at Trial
¶ 18 In an action to terminate parental rights, State must prove its case by clear and convincing evidence. In re S.B.C., 2002 OK 83, ¶ 6 n. 11, 64 P.3d 1080, 1082 n. 11. "Clear and convincing evidence" is defined as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegation sought to be established." In re C.G., 1981 OK 131, ¶ 17 n. 12, 637 P.2d 66, 71 n. 12.

Appellate Standard of Review
[T]o warrant affirmance of nisi prius (trial court) findings, appellate review in a parental-bond-severance proceeding must demonstrate the presence of clear-and-convincing evidence to support the first-instance decision.
In re S.B.C., at ¶ 7, 64 P.3d at 1082.
¶ 19 In reviewing a claim that the procedure used in a termination hearing resulted in a denial of a constitutional right, such as due process or equal protection, appellate courts review the issue de novo." De novo review requires an independent, non-deferential re-examination of another tribunal's legal rulings." In re A.M. & R.W., 2000 OK 82, ¶ 6, 13 P.3d 484, 487.

ANALYSIS
¶ 20 On appeal, Mother asserts several allegations of error: 1) State presented insufficient evidence to support termination of her parental rights; 2) 10 O.S.2001, § 7006-1.1(A)(5) does not apply to parents who are minors; 3) her constitutional rights to due process and equal protection were violated.
¶ 21 State sought termination of Mother's parental rights pursuant to 10 O.S.2001, § 7006-1.1(A)(5). That statute provides, in relevant part:
A. Pursuant to the provisions of the Oklahoma Children's Code, the finding that a child is delinquent, in need of supervision or deprived shall not deprive the parents of the child of their parental rights, but a *510 court may terminate the rights of a parent to a child in the following situations; provided, however, the paramount consideration in proceedings concerning termination of parental rights shall be the health, safety or welfare and best interests of the child:
. . .
5. A finding that:
a. the child has been adjudicated to be deprived, and
b. such condition is caused by or contributed to by acts or omissions of the parent, and
c. termination of parental rights is in the best interests of the child, and
d. the parent has failed to show that the condition which led to the adjudication of a child deprived has been corrected although the parent has been given not less than the time specified by Section 7003-5.5 of this title to correct the condition;
¶ 22 The plain language of this section casts upon State the burden to prove by clear and convincing evidence: child's adjudication as deprived; a parent's acts or omissions caused or contributed to child's deprived condition; and termination of parental rights is in child's best interests. See 10 O.S. § 7006-1.1(A)(5)(a), (b), & (c). The burden of persuasion then shifts to the parent to show correction of the conditions leading to child's deprived adjudication. See § 7006-1.1(A)(5)(d); In re J.K., 2002 OK CIV APP 130, ¶ 8, 62 P.3d 807, 809 (citations omitted).
¶ 23 Mother contends she corrected the conditions that led to E.S.' deprived adjudication.[3] Mother notes she cut off all relations with sex offender; she is not using the internet to engage in sexual encounters; she does not reside in a shed; she has not run away from her father's home in several months; Grandfather's home is an appropriate home for E.S.; and she completed parenting and non-offender classes. Mother acknowledges certain aspects of the ISP were not completed, but asserts those elements were not conditions which led to the finding of a deprived status. Mother notes the failure to comply with a treatment plan is not grounds for termination. See In re K.C., 2002 OK CIV APP 58, 46 P.3d 1289. Thus, she asserts she corrected the very conditions that led to E.S.' deprived status.
¶ 24 We disagree. State's petition sought a determination that E.S. was deprived because he was destitute or homeless; did not have the proper parental care; and/or the home was an unfit place by reason of neglect. State set forth additional facts more specifically describing the conditions leading to E.S.' deprived status. Mother, who was present with counsel, stipulated to each allegation. The ISP was created to address each condition, including the general and more specific allegations. When State sought to terminate Mother's rights, it alleged she failed to correct each of those conditions. We reject Mother's contention that merely not seeing sex offender, not using the internet to seek sexual encounters, or not living in a dilapidated shed were the only conditions which led to E.S.' deprived status and thus, the only conditions to correct.
¶ 25 On the record presented, we must conclude there is sufficient evidence to support termination. Although we agree with Mother that failure to comply with an ISP is not grounds by itself for termination, see In re K.C., 2002 OK CIV APP 58, 46 P.3d 1289, State has proved by clear and convincing evidence that Mother failed to correct the conditions that led to E.S.' deprived status. Mother testified she understood the requirements on her part that would prevent termination of her parental rights and that she knew she could not regain custody of E.S. unless she maintained appropriate housing, maintained consistent employment, attended counseling, and completed certain programs which had been recommended to assist her in parenting and in making good choices. Despite this knowledge, Mother continued to run away from her father's home, started to take drugs, did not avail herself of the programs available to help her, continued to see sex offender, and continued to see Grandmother.
¶ 26 Mother had almost a year to take action to change the conditions. Mother *511 made little or no effort to change any of the conditions that led to E.S.' deprived status or to comply with the ISP until after the original October 2006 trial date, despite being given numerous opportunities. And even then, Mother did not attend or complete the required family and individual counseling, she did not obtain a job, she did not complete a substance abuse program, and the DHS caseworker testified she was unable to verify if Mother was enrolled in school or GED classes. Furthermore, Mother was asked to leave a substance abuse program, which she had enrolled in on November 21, 2006, only the week before the trial at issue began. Finally, Mother was unable to demonstrate or explain what she had learned from the parenting and non-offender programs she did complete. Accordingly, we find the evidence supports the jury's verdict that Mother failed to correct the conditions that led to E.S.' deprived status and that termination is in E.S.' best interests.
¶ 27 For her next proposition of error, Mother asserts § 7006-1.1(A)(5) should not apply to parents who are minors and that the application thereof violated her due process and equal protection rights.
¶ 28 Initially, we note the record reveals Mother did not object at any stage of the proceedings to the application of § 7006-1.1(A)(5) to her as a minor or that her due process or equal protection rights were violated. Failure to object at trial deprives the trial court of the opportunity to rule on the law. "Issues not properly presented to the trial court cannot be considered by this Court on appeal." Dunham, Jr. v. Dunham, 1989 OK CIV APP 44, ¶ 8, 777 P.2d 403, 405 (citing Steiger v. City National Bank of Tulsa, 1967 OK 41, 424 P.2d 69 (syllabus by the court)).
¶ 29 However, since Mother has a constitutionally protected liberty interest in the continuity of the legal bond with E.S., we will address her propositions of error despite her failure to object. See In re A.M. & R.W., 2000 OK 82, at ¶ 8, 13 P.3d at 487 (citations omitted).
¶ 30 Mother asserts § 7006-1.1(A)(5) should not apply to parents who are minors, citing 10 O.S.2001, § 7006-1.1(A)(1) for support. Section 7006-1.1(A)(1) provides, in relevant part:
1. Upon a written consent of a parent, including a parent who is a minor, acknowledged as provided in paragraph 4 of subsection B of Section 7503-2.1 of this title, who desires to terminate such parent's parental rights; provided that the court finds that such termination is in the best interests of the child; . . . (Emphasis added.)
¶ 31 Mother contends that by adding the language "including a parent who is a minor," the Legislature evinced a direct and clear statement that minors should be considered as parents under § 7006-1.1(A)(1). However, the Legislature did not include corresponding language in § 7006-1.1(A)(5) and thus, the Legislature evidenced an intent that parents who are minors should not have their parental rights terminated pursuant to this section while they are under the age of majority.
¶ 32 State disagrees, and asserts the plain meaning of "parent" in § 7006-1.1(A)(5) means the lawful mother or father. See Black's Law Dictionary 1137 (7th Ed.1999). State further asserts the language in § 7006-1.1(A)(1) applies to a specific situation and does not evince an intent by the Legislature to bar courts from terminating parental rights of minor parents. Section 7006-1.1(A)(1) cites 10 O.S.2001, § 7503-2.1(B)(4), which specifically provides that a minor parent who is 16 years or older is deemed capable of giving consent to the adoption of the minor child.
¶ 33 We reject Mother's assertion that § 7006-1.1(A)(5) should not apply to her as minor parent. The paramount consideration in all proceedings concerning a child alleged or found to be deprived is the health, safety, and the best interests of the child. See 10 O.S.2001, § 7001-1.2. Requiring State to wait some arbitrary time limit until a minor parent reaches the age of majority does not take into consideration the best interests of the minor child, including his need for permanency. Although "[l]oss of parental rights is extremely important, [] it should be weighed against the loss by the child of the right to a *512 prompt judicial determination of his status." In the Matter of K.N.L., 2007 OK CIV APP 22, ¶ 13, 154 P.3d 1276, 1280 (citing In re J.L.D., 14 Kan.App.2d 487, 794 P.2d 319, 322 (1990)). Accordingly, we reject this proposition of error.
¶ 34 We further reject Mother's assertion that her due process and equal protection rights were violated by the application of § 7006-1.1(A)(5) to her as a minor. Mother clearly has the fundamental right to the care, custody, and continuity of the legal bond with E.S. See In re A.M. & R.W., 2000 OK 82, 13 P.3d 484. Any action taken to deprive a fundamental right must afford the person the "full panoply of procedural safeguards," as well as substantive protection under the due process clauses. Id. at ¶ 8, at 487.
¶ 35 "In determining whether an individual has been denied procedural due process we engage in a two-step inquiry, asking whether the individual possessed a protected interest to which due process protection applies and if so, whether the individual was afforded an appropriate level of process." Id., at ¶ 7, at 484 (citations omitted). Since Mother clearly has a constitutionally protected liberty interest in the continuity of the legal bond with E.S., we must address whether she was afforded an appropriate level of process. The Court is guided by the seminal case of Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).
¶ 36 In Mathews, the United States Supreme Court held that in considering what process is due, three factors must be assessed. First, a court must consider the private interest that will be affected by the action. Id. at 335, 96 S.Ct. 893. Second, the court must consider the risk of erroneous deprivation posed by the procedures employed and the probable value, if any, that extra or substitute procedures would provide. Id. Lastly, the court must consider the governmental interest at stake, including administrative and fiscal burdens alternate procedures would generate. Id.
¶ 37 In the context of a termination proceeding, both the parental interest in maintaining the family bond and the state's interest in the welfare of the child is of utmost importance. In re A.M. & R.W., 2000 OK 82, at ¶ 11, 13 P.3d at 488 (citations omitted). Since these are two (2) strong countervailing interests, we must determine whether the procedure employed posed a risk of an erroneous deprivation of Mother's rights.
¶ 38 Mother asserts' since she is a minor she is less likely to be able to effectively assist in her case, less likely to be able to adequately articulate her testimony, and could be seen by adults as less likely to be able to provide a proper environment for E.S. Mother asserts these problems could be remedied by not allowing a termination proceeding to occur until the minor parent is of majority age.
¶ 39 State disagrees, and asserts Mother's interests are adequately protected through all stages of the proceedings. State must prove its case by clear and convincing evidence, Mother has the right to assistance of counsel, and she has the right of appeal. Mother was given the same opportunities to work an ISP, to correct the conditions as an adult parent, and she was treated no differently than a parent of majority age. State further asserts it has a compelling interest in protecting the deprived child from the unfitness of his parent and in providing permanency for the child without having to wait until a parent reaches majority age.
¶ 40 We reject Mother's assertions that the application of § 7006-1.1(A)(5) to her violated her procedural due process rights. We find Mother was given the requisite due process she was entitled. At the time of trial, Mother was seventeen years old and had already been given almost a year to correct the conditions which led to E.S.' deprived status. Mother was given notice as early as May of 2006 that the State was seeking termination of her rights under § 7006-1.1(A)(5). Thus, Mother was clearly afforded adequate notice of the grounds for termination. In addition, Mother was represented by counsel throughout the proceedings, including at trial, and was able to and did in fact take full advantage of her opportunity to appear and be heard at trial and to prosecute her appeal. *513 Thus, she was afforded adequate procedural due process.
¶ 41 Furthermore, Mother was afforded sufficient substantive due process. "Substantive due process forbids termination [of parental rights] in the absence of a demonstration of a compelling state interest in the form of specific findings of existing or threatened harm to the child." In the Matter of Baby Girl L., 2002 OK 9, ¶ 23, 51 P.3d 544, 555. In determining whether the application of § 7006-1.1(A)(5) constitutes a substantive due process violation, a balance must be struck between the fundamental, constitutionally protected right of a parent to their child and the state's compelling interests which justify intervention, i.e., the best interests of the child. See In the Matter of Blevins, 1984 OK CIV APP 41, 695 P.2d 556.
¶ 42 The ultimate goal of § 7006-1.1(A)(5) is to protect children from harm suffered by either neglect or the intentional actions of their parents. The statute further seeks to prevent the harms of extended foster care and to provide the minor child with the opportunity of continuous care in a stable and permanent home environment. We find § 7006-1.1(A)(5) is drawn narrowly and requires State to prove its compelling interest(s) by clear and convincing evidence. By applying § 7006-1.1(A)(5) to the instant facts, State sought what was in the best interests of E.S. Thus, Mother was not denied substantive due process.
¶ 43 Finally, § 7006-1.1(A)(5) makes no classification and applies equally to all parents. Accordingly, Mother was not denied equal protection under the law. See e.g., In the Matter of A.G. & E.G., 2000 OK CIV APP 12, ¶ 2, 996 P.2d 494, 496 (citing Lebus v. Carden, 1978 OK 91, 583 P.2d 503).
¶ 44 The trial court's January 9, 2007, journal entry terminating Mother's parental rights following a jury trial is affirmed.
¶ 45 AFFIRMED.
GABBARD, P.J., and REIF, J., concur.
NOTES
[1] State's motion to dismiss appeal is denied.
[2] State filed a second amended petition on August 21, 2006, adding Christopher Rogers as the putative father of E.S. On August 24, 2006, Rogers consented to the termination of his parental rights.
[3] Mother has not disputed that the first two elements of § 7006-1.1(A)(5) have been established.